UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO. 7:23-TR- 77777-cri(1) |
| | ) | |
| | ) | **SENTENCING MEMORANDUM** |
| -vs- | ) | |
| | ) | |
| JAMES DOE | ) | |

Youth is a time of "immaturity, irresponsibility, 'impetuousness[,] and recklessness.'" *Miller v. Alabama*, 567 U.S. 460, 476, 183 L. Ed. 2d 407, 422 (2012) (quoting *Johnson v. Texas*, 509 U.S. 350, 368, 125 L. Ed. 2d 290, 306 (1993)). Because juveniles lack maturity and have an underdeveloped sense of responsibility, their conduct "often result[s] in impetuous and ill-considered actions and decisions." *Johnson*, 509 U.S. at 367, 125 L. Ed. 2d at 306. Indeed, research into brain development confirms that adolescence is marked by "transient rashness, [a] proclivity for risk, and [an] inability to assess consequences." *Miller*, 567 U.S. at 472, 183 L. Ed. 2d at 419. For these reasons, "adolescents are overrepresented statistically in virtually every category of reckless behavior." *Roper v. Simmons*, 543 U.S. 551, 569, 161 L. Ed. 2d. 1, 21 (2005) (quoting Arnett, *Reckless Behavior in Adolescence: A Developmental Perspective*, 12 Developmental Review 339 (1992)).

## INTRODUCTION

The medical community has now overwhelmingly determined that adolescents in their late teens and early twenties are more comparable to their younger peers than they are to adults in their late twenties or older with developed brains. For the same reasons *Roper, Miller, and Graham* extended the categorical bars to all adolescents under eighteen, conformity with Eighth Amendment standards now counsels this Court to apply the principles of those cases to youths up to their mid-twenties, and especially for those who, like Jonathan, have other factors further delaying their development.

**DISCUSSION**

*Roper v. Simmons*, 543 U.S. 551 (2005), prohibited imposition of the death penalty on juveniles under eighteen. This was because the science available at that time distinguished juveniles under eighteen from adults in three key ways relevant to criminal justice policy: (1) a lack of maturity and lesser sense of responsibility, leading to increased risk-taking; (2) susceptibility to negative influences, including peer pressure; and (3) the transient nature of juveniles' personality traits. *Id.* at 569-70. *Graham v. Florida*, 560 U.S. 48 (2010) employed these same factors to prohibit mandatory life sentences for non-homicide offenders under age 18 at the time of the offense. *Miller v. Alabama*, 567 U.S. 460 (2012) extended *Graham* to juveniles who committed murders before their eighteenth birthdays.

Part of the reason the scientific consensus was not previously available is that, until recently, researchers understood "[y]oung adults between the ages of eighteen and twenty-one [to] constitute a less well-defined category that has only recently received even informal acknowledgement." *See* Scott, Elizabeth S., Bonnie, Richard J., & Steinberg, Laurence, *Young Adulthood as a Transitional Legal Authority: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641, 643 (Nov. 2016). While the beginnings of the idea previously existed that "psychological and neurobiological development that characterizes adolescence continues into the mid-twenties, the research [had] not yet produced a robust understanding of maturation in young adults age eighteen to twenty-one." *Id.* at 653. Brain development research had been so focused on adolescents under eighteen that most studies were not systematically looking at adolescents older than eighteen; instead, they were often lumped in with other adults as old as fifty. *Id.* at 651. Thus, even as of 2016, "the developmental research suggesting that young adults are not fully mature [was] in an early stage." *Id.* at 643. It is only recently that science turned its attention to older adolescents and provided a newly-formed consensus that many of the same traits possessed by

juveniles under eighteen—traits that make them ineligible for the death penalty and mandatory life without parole sentences—also apply to older adolescents in their late teens and early twenties.

In *Roper*, the United States Supreme Court relied heavily on neuroscience research on adolescent brain development to find that juveniles under eighteen differ from adults in three ways. *Roper*, 543 U.S. at 569. While the Court relied on several neuroscience studies, its conclusions were based extensively on the works of Laurence Steinberg and Elizabeth S. Scott. In November 2016, Steinberg and Scott, along with another author, published an article on recent findings regarding the brain development of what they termed "young adults," those aged eighteen to twenty-one. *See* Scott, E., Bonnie, R., & Steinberg, L., *Young Adulthood as a Transitional Legal Authority: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641, 642 (Nov. 2016).

 The article explained that since the time of *Roper*, "developmental psychologists and neuroscientists have found that biological and psychological development continues into the early twenties, well beyond the age of majority. Recently, researchers have found that eighteen- to twenty-one-year old adults are more like younger adolescents than older adults in their impulsivity under conditions of emotional arousal." *Id.*

While it may have been known when the Supreme Court decided *Roper* that brain development continued into the twenties, the *consequences* of that delayed development were still unknown until recently. In their 2016 article, Scott and Steinberg stated, "[U]ntil recently, no compelling scientific argument existed for treating young adults differently than their older counterparts." *Id.* at 643. Rather, "[y]oung adults between the ages of eighteen and twenty-one constitute a less well-defined category that has only recently received even informal acknowledgement." *Id.* at 644. Thus, even as of 2016, the "*developmental research suggesting that*

*young adults are not fully mature [was] in an early stage*." *Id.* at 643 (emphasis added). While it had been "clear that the psychological and neurobiological development that characterizes adolescence continues into the mid-twenties, "the research *[had] not yet produced a robust understanding of maturation in young adults age eighteen to twenty-one*." *Id.* at 653 (emphasis added).

The focus of the earlier science was on juveniles *under* eighteen. As Steinberg and Scott explained, the prior studies, including those relied upon by the Supreme Court in *Roper*, compared the group then viewed as adolescents—those under eighteen—to adults. There were "very few studies [that] systematically examined age differences in brain development among individuals older than eighteen." *Id.* at 651. Most of those studies compared adolescents to "'adult[s],' with the latter group composed of people who may be as young as nineteen or as old as fifty." *Id.* When the adult group covered "data from such a wide age range, it [was] impossible to draw specific inferences about potential differences between young adults and their older counterparts." *Id.* As a result, young adults like Jonathan were lumped in with older adults and believed to be more mature than their under-eighteen counterparts.

After *Graham*, the scientific community began to engage in more targeted research to answer the questions about the effects of incomplete brain development on young people in their early twenties and late teens. For example, there has been an "increasing array of typical child and adolescent behavioral processes that have been examined in relationship to brain maturation and genetic factors." Barasso-Catanzaro, C.; Eslinger, P., *Neurobiological Bases of Executive Function and Social-Emotional Development: Typical and Atypical Brain Changes*, Interdisciplinary J. of Applied Family Studies, at 108 (February 2016). In 2013, the National Academy of Science's Institute of Medicine convened a task force to look into the "health, safety, and well-being of young adults" aged eighteen to twenty-six. *See* Bonnie, R., et al., Inst. of Med. & Nat'l Res. Council,

*Investing in the Health and Well-Being of Young Adults*, at xv (2015). By that fall, the Committee formed a group to conduct a study to "address the needs of young adults and guide policy makers and other stakeholders in meeting those needs." *Id.* A key reason for this task force was that young adults "are too rarely treated as a distinct population in policy, program design and research. Instead, they are often grouped with adolescents or, more often, with all adults." *Id.* at 1. As part of that study, the Committee broke down the level of risk-taking among young adults and noted that research as of 2015 was beginning to recognize that "young adults (aged eighteen to twentyfour) experience higher rates of morbidity and mortality than either adolescents or older adults from a wide variety of preventable causes, including automobile crashes, physical assaults, gun violence, sexually transmitted diseases, and substance abuse." *Young Adulthood*, at 645-46.

The same is true for recent developments in the science of trauma and brain development. The Center on the Developing Child at Harvard stated that, as of 2016, researchers began to understand the effect of social class on health and learning outcomes but that "neuroscience [was just then linking] environment, behavior, and brain activity." *See* Hayasaki, E., *This is Your Brain on Poor*, Newsweek (Sept. 2, 2016). Mary Helen Immordino-Yang, a neuroscientist at the University of Southern California's Brain and Creativity Lab who has been conducting exactly that research on stressful childhood environments and brain development, explained that, as of 2016, "the scientific revolution is only beginning." *Id.* She said, "We're *starting* to get an appreciation of the richness of the social story—the social stress . . . that is really driving these kinds of effects and shaping brain development and biological development . . . ." *Id.* (emphasis added).

Based on this new medical consensus, on February 5, 2018, the American Bar Association passed a resolution specifically addressing that, under evolving standards of decency, people who were twenty-one and younger at the time of their capital offense should not be executed. The ABA explained:

In light of this evolution of both scientific and legal understanding surrounding young criminal defendants and broader changes to the death penalty landscape, it is now time for the ABA to revise its dated position and support the exclusion of individuals who were 21 years old or younger at the time of their crime."

Rawles, L., *Ban Death Penalty for Those 21 or Younger, ABA House Says*, ABA Journal (Feb. 5, 2018). Research has shown that "individuals in the young adult period (i.e. ages 18-21)" are at a greater risk to engage in risky behavior than younger adolescents, which indicates "that this period of development is an important transition." Rudolph, M., *At Risk of Being Risky: The Relationship between 'Brain Age' under Emotional States and Risk Preference*, Dev. Cognitive Neurosci. 24:93-106 at 102 (2017).

It is important to note that the line *Roper* drew was in accordance with the then existing scientific consensus. See *Cruz v. United States*, 2018 WL 1541898, at *15 (D. Conn. Mar. 29, 2018) (" In drawing the line at 18, ...*Roper*, *Graham*, and *Miller* drew lines ...protecting offenders that fall under the line while remaining silent as to offenders that fall above the line.... Therefore, while this court recognizes that it is undoubtedly bound by Supreme Court precedent, it identifies no Supreme Court precedent that would preclude it from applying the rule in *Miller* to an 18-yearold defendant."), citing *Commonwealth of Kentucky v. Bredhold*, No. 14-CR-161, *Order Declaring Kentucky's Death Penalty Statute as Unconstitutional* (Fayette Circuit Court, August 1, 2017)(declared the state's death penalty statute unconstitutional as applied to those under the age of 21, based on a finding of a "consistent direction of change" that "the national consensus is growing more and more opposed to the death penalty, as applied to defendants eighteen (18) to twenty-one (21).") This court, then, is free to consider the scientific consensus that brain development continues well into a person's twenties. Other institutions have done so.

In a May 2017 report by the United States Sentencing Commission, *Youthful Offenders in the Federal System* ("Youthful Offenders), the Commission begins by defining a youthful offender

as a person "age 25 or younger at the time they are sentenced in the federal system." *Youthful Offenders* at *1. The Report explains:

> Traditionally, youthful offenders often have been defined as those under the age of 18, but for purposes of this study, the Commission has defined youthful offenders as a federal offender 25 years old or younger at the time of sentencing. The inclusion of young adults in the definition of youthful offenders is informed by recent case law and neuroscience research in which there is a growing recognition that people may not gain full reasoning skills and abilities until they reach age 25 on average.

*Youthful Offenders* at *5.

The Report notes that "researchers caution against the over-generalization of brain science," but summarizes the emerging scientific consensus concerning brain maturation as follows:

> [T]here are a number of points on which researchers in this area generally agree. First, researchers agree that the prefrontal cortex is not complete by the age of 18, which is the legal age of majority in most state jurisdictions and in the federal system. Second, researchers agree that development continues into the 20s. Third, most researchers reference 25 as the average age at which full development has taken place, but note there will be significant variation from person to person.

*Youthful Offenders* at *7. See also, Alexandra Cohen, Richard Bonnie, Kim Taylor-Thompson and BJ Casey, *When Does a Juvenile Become and Adult? Implications for Law and Policy*, 88 Temple Law Rev. 769, 783(2016) (summarizing recent scientific research on brain maturation and noting that "noninvasive brain imaging and postmortem studies have shown continued regional development of the prefrontal cortex, implicated in judgment and self-control beyond the teen years and into the twenties.") This includes the frontal lobes which play a crucial role in making good decisions, controlling impulses, focusing attention for planning, and managing emotions. Science now understands that the process of maturation involves three components of brain function: 'gray matter'- the outer layer of the brain, 'white matter connections' - the brain cells serving as the 'wiring' between neurons, and activity in the chemicals or neurotransmitters' that

execute messages within the brain. All three are compromised in an individual in his early 20's. Measures of brain function and structure employing sophisticated technology support this new scientific recognition."[1]

[1] Other authorities have stated the same conclusions again and again. See e.g., Laurence Steinberg, et. al., *Around the World, Adolescence is a Time of Heightened Sensation Seeking and Immature Self-Regulation*, 21 Developmental Science 1 (2018) ("Self-regulatory capacities may reach adultlike levels at around age 15 in relatively less arousing, 'cool' contexts, but when tasks become more demanding or emotionally arousing, adult-like performance may not be reached until closer to the mid-20s. These findings are consistent with a growing neuroimaging literature showing amplified activation of reward-processing regions (e.g. the ventral striatum and medial prefrontal cortex) in adolescents compared with children and adults, and gradual maturation over the course of adolescence and young adulthood within brain regions that subserve executive function (e.g. lateral prefrontal and parietal cortices and the anterior cingulate)"), Surgeon General Vivek Murthy, *E-Cigarette Use Among Youth and Young Adults: A Report of the Surgeon General—Executive Summary*, Atlanta, GA: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, 2016, Fact Sheet 508 ("The brain is the last organ in the human body to develop fully. Brain development continues until the early to mid-20s. Nicotine exposure during periods of significant brain development, such as adolescence, can disrupt the growth of brain circuits that control attention, learning, and susceptibility to addiction... The effects of nicotine exposure during youth and young adulthood can be long-lasting and can include lower impulse control and mood disorders."),available at https://e-cigarettes.surgeon general.gov/documents/2016_SGR_Fact_Sheet_508.pdf; Bradley Taber-Thomas and Koraly Perez-Edgar, *Emerging Adulthood Brain Development*, in Jeffrey Jensen Arnett (Ed.), The Oxford Handbook of Emerging Adulthood, Oxford University Press (1st ed. pp. 126-131), Oxford England, 2016 (observing "neurodevelopment in EA [early adulthood] involves prominent changes in association corticies and the frontolimbic systems involved in executive attention, regard and social processes. In addition, alterations in neurodevelopment trajectories in EA may underlie differences in functioning and new vulnerabilities to psychopathology evident in this developmental window.").

Based on the consensus in the medical community that brain development reaches into the mid-twenties, that the lack of development still impacts older adolescents and people in their early twenties in ways relevant to the criminal justice system, and that alcohol and trauma further delay brain development, Jonathan should merit the same consideration as someone under eighteen years of age should receive. By virtue of his underdeveloped brain, James was not yet a fully developed adult at the time of his crime. The penological purposes which underpinned *Graham* also apply in

James' case: "the impotence of deterring juveniles, the shortcomings of retribution as a result of diminished culpability, the increased opportunity for reform that vitiates incapacitation, and the irreconcilable tension between LWOP sentences and rehabilitation. These distinctive attributes are equally relevant regardless of the crime or of the formal distinction between de facto and de jure LWOP sentences." *United States v. Grant*, 887 F. 3d 131, 144 (3rd Cir. 2018).

James may be even more at risk than the average 18-25 year old male. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ [3]

---

[2] Alcohol in the mother's blood passes to the baby through the umbilical cord. Drinking alcohol during pregnancy can cause miscarriage, stillbirth, and a range of lifelong physical, behavioral, and intellectual disabilities. These disabilities are known as fetal alcohol spectrum disorders (FASDs). Children with FASDs might have the following characteristics and behaviors: Abnormal facial features, such as a smooth ridge between the nose and upper lip (this ridge is called the philtrum); Small head size; Shorter-than-average height; Low body weight; Poor coordination; Hyperactive behavior; Difficulty with attention; Poor memory; Difficulty in school (especially with math); Learning disabilities; Speech and language delays; Intellectual disability or low IQ; Poor reasoning and judgment skills; Sleep and sucking problems as a baby; Vision or hearing problems; and/or

Problems with the heart, kidney, or bones. There is no known safe amount of alcohol to drink while pregnant. https://www.cdc.gov/ncbddd/fasd/alcohol-use.html [3] Different terms are used to describe FASDs, depending on the type of symptoms.

- **Fetal Alcohol Syndrome (FAS):** FAS represents the most involved end of the FASD spectrum. Fetal death is the most extreme outcome from drinking alcohol during pregnancy. People withFAS might have abnormal facial features, growth problems, and central nervous system (CNS) problems. People with FAS can have problems with learning, memory, attention span, communication, vision, or hearing. They might have a mix of these problems. People with FAS often have a hard time in school and trouble getting along with others.
- **Alcohol-Related Neurodevelopmental Disorder (ARND):** People with ARND might have intellectual disabilities and problems with behavior and learning. They might do poorly in school and have difficulties with math, memory, attention, judgment, and poor impulse control.
- **Alcohol-Related Birth Defects (ARBD):** People with ARBD might have problems with the heart, kidneys, or bones or with hearing. They might have a mix of these.

- The term FASDs is *not* meant for use as a clinical diagnosis. CDC worked with a group of experts and organizations to review the research and develop guidelines for diagnosing FAS. The guidelines were developed for FAS only. CDC and its partners are working to put together diagnostic criteria for other FASDs, such as ARND. Clinical and scientific research on these conditions is going on now.
- Diagnosing FAS can be hard because there is no medical test, like a blood test, for it. And other disorders, such as ADHD (attention-deficit/hyperactivity disorder) and Williams syndrome, have some symptoms like FAS.
- To diagnose FAS, doctors look for:
- Abnormal facial features (e.g., smooth ridge between nose and upper lip)
- Lower-than-average height, weight, or both
- Central nervous system problems (e.g., small head size, problems with attention and hyperactivity, poor coordination)
- Prenatal alcohol exposure; although confirmation is not required to make a diagnosis
  So what punishment should Jonathan he receive?

 The Guidelines say thirty to fifty years plus a consecutive 10 years, producing a recommended range of 40-60 years. In *Dean v. United States,* the Supreme Court held a sentencing court is not prohibited from considering the impact of the mandatory minimum sentence required under 18 U.S.C. § 924(c) when determining the appropriate sentence for the predicate offense. *Dean*, 130 S. Ct. 1170, 1176 (2017) (nothing in §924(c) restricts the authority conferred on sentencing courts

by § 3553(a) and the related provisions to consider a sentence imposed under §924(c) when calculating a just sentence for the predicate count.)

James committed these offenses when he was twenty-one years, five months old. A 40year sentence would be a de facto life sentence for James. While the average life expectancy for all males born today is 76.62 years, See *S.C. Code Ann §19-1-150*, it is lower for minorities, and significantly lower for prison inmates. See *http://www.efmoody.com/estate/ lifeexpectancy.html*. Long sentences in prison, with its stressors, violence, and disease, significantly shorten one's life expectancy. See *United States v. Taveras*, 436 F. Supp. 2d 493, 500

- FASDs last a lifetime. There is no cure for FASDs, but research shows that early intervention treatment services can improve a child's development.
- There are many types of treatment options, including medication to help with some symptoms, behavior and education therapy, parent training, and other alternative approaches. No one treatment is right for every child. Good treatment plans will include close monitoring, follow-ups, and changes as needed along the way.
- Also, "protective factors" can help reduce the effects of FASDs and help people with these conditions reach their full potential.[1, 2]
- Protective factors include:
- Diagnosis before 6 years of age
- Loving, nurturing, and stable home environment during the school years
- Absence of violence
- Involvement in special education and social services

  https://www.cdc.gov/ncbddd/fasd/facts.html

(E.D.N.Y. 2006) (Life expectancy within federal prison is considerably shortened); Il EOR 72, Feld, *Symposium on Youth* and *the Law*, 22 ND J L Ethic Pub Pol 9, 63, fn. 231 (2008) citing, Elizabeth Arias, Ctr. for Disease Control, U.S. Life Tables, 2003, Nat'l Vital Statistics Rep., April 19, 2006, at 3, available at: *http://www.cdc.gov/nchs/data/nvsr/nvsr54/nvsr54_14.pdf*.

The United States Sentencing Commission defines a life sentence as 470 months (39 years and 2 months). This is based on average life expectancy and median age of individuals at the time

of                 sentencing.                 https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federalsentencing-statistics/quarterly-sentencing-updates/USSC-2017_Quarterly_Report_Final.pdf at A7. The median sentence for murder is 180 months, and the median sentence is 224 months. *Id.* at Table 6. See also *U.S. v. Nelson*, 491 F 3d 344, 349-50 (7th Cir. 2012) (acknowledging the life expectancy for incarcerated individuals based on United States Sentencing Commission data). A recent Michigan study found that the average life expectancy for Michigan adults incarcerated for natural life sentences decreased to 58.1 years. http://www.lb7.uscourts.gov/documents/1712441.pdf. When adjusted for race, the average life expectancy for African-American adults, sentenced to natural life, is 56.0 years, and for whites, 60.1 years.

James' life expectancy from today as a non-prisoner is between 53 and 49 years. https://www.cdc.gov/nchs/data/nvsr/nvsr66/nvsr66_03.pdf. As noted above, his actual life expectancy as a prison inmate is much less than 54 years. The life expectancy of an incarcerated person drops significantly for each year of incarceration. *See* Evelyn J. Patterson, *The Dose*B*Response of Time Served in Prison on Mortality: New York State, 1989*B*2003*, 103 Am. J. of Pub. Health 523, 526 (2013) cited in *United States v. Jenkins*, 854 F.3d 181, n. 2 (2d Cir. 2017). More pessimistically and specific to James, a black male born in 1995 has a life expectancy of 65.2 year, underscoring that a sentence of 40 years for Jonathan would be a *de facto* life sentence. https://www.cdc.gov/nchs/data/hus/hus16.pdf#015

Although it is roughly stated that a federal inmate will serve 85% of their sentence if they earn all the "good time" credits to which they are entitled, the actual percentage is closer to 87%. Nevertheless, using 85% as the multiplier for a forty-year sentence, if James earns all of his good

time credits, he will serve 408 months, or 34 years, making him 58 years old at the time of release, older than the average black male sentenced to life in prison. Being realistic, however, the likelihood of him earning all his good time credit is not good. First, he is a young. Younger men have a tougher time adjusting to prison. Second, he will be sent to a United States Prison. His offense is violent, and the BOP will place him in a very secure facility with other men convicted of violent offenses. Third, he is a small man, who could be picked on by other, bigger, stronger inmates. The likelihood is that James will serve more than the minimum sentence of 34 years.

James faces a staggering amount of time in federal prison. He deserves to be punished severely. His crimes are senseless. The impact on the victims cannot be overstated. Current science, however, demonstrates that the prefrontal cortex, crucial to executive functioning—which encompasses a broad array of abilities such as impulse control, risk management, and decision making—continues to develop until "at least the mid-twenties." Until then, brains are not yet fully developed. People without fully developed brains are prone to immaturity, recklessness, and impulsivity. Youths up to their mid-twenties have the same impulsivity as youths eighteen and under. They act rashly, without reflection and full consideration of the consequences of their actions. They do not grow out of this behavior until their brains have fully formed. Young adult offenders like James are still in the neurological development phase and have transitory personality traits as they search for a stable, authentic identity. Jonathan, particularly, was susceptible to act impulsively given his mother's alcohol use when she was pregnant with James. James experienced an impoverished and chaotic upbringing. He was a poor student. Sadly enough, his early and growing use of alcohol and drugs is entirely predictable. All of this surely increased the risk that he would act impulsively and engage in poorly thought out activities.

Based on the transient nature of youthful impulsivity, recklessness, and poor judgement, along with the likelihood that James suffers from some impairment due to his mother's consumption of alcohol while pregnant with James, James requests a sentence of thirty years in prison.

Respectfully Submitted,

**/s/ WILLIAM F. NETTLES, IV,**
Federal Public Defender
McMillan Federal Building 401
W. Evans Street, Suite # 105
Florence, South Carolina 29501
Phone: (843) 662-1510
Attorney ID#: 5935

Columbia, South Carolina

April 9, 2024